## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| **Parkview Adventist Medical Center,** | ) | **Case No. 15-20442** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **Parkview Adventist Medical Center,** | ) | |
| | ) | |
| Plaintiff, | ) | **Adv. No. 15-2019** |
| | ) | |
| v. | ) | |
| | ) | |
| **Central Maine Healthcare Corporation,** | ) | |
| **Central Maine Medical Center, and** | ) | |
| **Bridgton Hospital,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Parkview Adventist Medical Center (the "Debtor" or "Parkview"), in its capacity as debtor-in-possession in the above-captioned bankruptcy case, brings this First Amended Complaint against Central Maine Healthcare Corporation (Central Maine Healthcare Corporation and its affiliates are hereinafter referred to as "CMHC"), Central Maine Medical Center (Central Maine Medical Center and its affiliates are hereinafter referred to as "CMMC"), and Bridgton Hospital ("BHS" and when combined with CMHC and CMMC, the "CM Entities").

This First Amended Complaint seeks (A) the avoidance of transfers to the CM Entities as fraudulent or preferential transfers under the Maine Uniform Fraudulent Transfer Act, codified in §§ 3571 *et seq.* of title 14 of the Maine Revised Statutes ("MUFTA"), and title 11 of the United States Code (the "Bankruptcy Code"), including payment of double damages, authorized

pursuant to § 3578 of MUFTA, in an amount not less than **$30 million** and the reconveyance of certain parcels of real estate in Brunswick, Maine; (B) the recharacterization or subordination of any debt obligation that Parkview may owe to the CM Entities; (C) damages for negligence and breach of fiduciary duty by CMHC, which served as Chief Executive Officer of Parkview at all times relevant to this First Amended Complaint; (D) entry of the Court's declaratory judgment that CMHC, as a former officer of Parkview, is liable for certain debts that it claims are owed to it by Parkview and which were incurred in violation of title 13-B of the Maine Revised Statutes (the "Non-Profit Corporation Act"); (E) a judgment that the CM Entities have violated applicable federal and state anti-trust laws; and (F) judgment that CMHC benefitted from the necessary and reasonable expenses incurred by Parkview in marshaling and liquidating certain assets and, pursuant to 11 U.S.C. § 506(c), that Parkview is entitled to surcharge CMHC for those expenses.

## JURISDICTION AND VENUE

1.      Parkview filed for relief under Chapter 11 of the Bankruptcy Code on June 16, 2015 (the "Petition Date"), thereby commencing a Chapter 11 bankruptcy case before this Court.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

3.      Venue of this Chapter 11 case in this District is proper pursuant to 28 U.S.C. § 1409(a).  Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409(b).

4.      This is not a core proceeding as defined in 28 U.S.C. § 157(b)(2).

5.      The Debtor does *not* consent to the entry of final orders by the Bankruptcy Court in this adversary proceeding, subject to review on appeal in accordance with applicable federal laws and rules.

## PARTIES

6.      The Debtor is a non-profit corporation organized under the laws of the State of Maine and prior to the sale of substantially all of its operating assets on or about August 20, 2015, it operated a faith-based community hospital located in Brunswick, Maine.  Its mission is to support physical, emotional and spiritual wellness of patients.

7.      CMHC is a non-profit corporation organized under the laws of the State of Maine and is a holding company for health care providers, including CMMC.  It has a principal place of business in Lewiston, Maine.

8.      CMMC is a non-profit corporation organized under the laws of the State of Maine operating a community hospital located in Lewiston, Maine, and with a principal place of business in Lewiston, Maine.  CMMC is a subsidiary or affiliate of CMHC.

9.      BHS is a non-profit corporation organized under the laws of the State of Maine operating a community hospital located in Bridgton, Maine, and with a principal place of business in Bridgton, Maine.  BHS is a subsidiary or affiliate of CMHC.

10.     The CM Entities may have other affiliates who were recipients of avoidable transfers and, upon their identification during discovery, Parkview shall seek leave to add any such affiliates as party-defendants in this proceeding.

## FACTS

11.     On or about February 26, 2008, Parkview executed and delivered a letter agreement (the "LOI") to CMHC pursuant to which Parkview and CMHC agreed to pursue a hospital affiliation in which CMHC was to become the sole corporate member of Parkview.

12.     As a result of the LOI and after its execution, CMHC was in a position to exercise substantial control and influence over the affairs of Parkview and, in fact, exercised such substantial control and influence.

13.     Upon information and belief, Parkview was financially distressed at the time that it entered into the LOI, and at all times thereafter, in that, without limitation, it was insolvent and unable to pay its debts as they became due.

14.     On or about April 25, 2008, Parkview entered into a purported loan transaction with CMHC pursuant to which CMHC advanced $5.6 million to Parkview, the repayment of which was purportedly governed by a promissory note of the same date, and was purportedly secured by mortgages and security interests in substantially all of the assets of Parkview (the "2008 Loan").

15.     The Board of Directors of Parkview (the "Board") (A) did not adopt a resolution recommending that Parkview's members (the "Members") approve granting mortgages and/or security interests in substantially all of Parkview's assets to CMHC to secure the 2008 Loan, and (B) did not direct that any pledge of Parkview's assets to CMHC to secure the 2008 Loan be submitted to a vote at a meeting of Members entitled to vote thereon.

16.     No notice was given to the Members of any meeting of Members, the purpose, or one of the purposes, of which would be to consider approval of a mortgage and/or pledge of substantially all of Parkview's assets to CMHC, to secure the 2008 Loan.

17.     No meeting was held at which the Members were asked to vote, or in fact voted, to approve a mortgage and/or pledge of substantially all of Parkview's assets to CMHC, to secure the 2008 Loan.

18.     As of the date of this First Amended Complaint, the Members have never adopted any vote, resolution or other form of consent, pursuant to which a majority of the Members have actually approved or ratified, in a meeting duly called and held, or otherwise conducted, the grant of a mortgage, security agreement, or pledge of substantially all of Parkview's assets to CMHC to secure the 2008 Loan.

19.     By reason of the failure of the Members to approve the 2008 Loan and the grant of security for the 2008 Loan, the mortgages and security interests granted to secure the 2008 Loan were and are unlawful, unenforceable and invalid.  As a result, to the extent that the 2008 Loan represents a valid and enforceable debt obligation of Parkview to CMHC ( a fact not conceded by Parkview), it is unsecured.

20.     In connection with the 2008 Loan, the Debtor executed and delivered to CMHC that certain Promissory Note Demand Advancing Term Note dated April 25, 2008, in the original principal amount of $5.6 million (the "Note").  Among other things, the Note contained a demand feature allowing it to be called at any time and for any reason.

21.     In the Note, Parkview agreed to certain covenants for the benefit of CMHC (the "Covenants") that were effective during the term of the Note, as set forth in ¶¶ (a) through (h) on page 5 of the Note.

22.     The Covenants and the demand feature of the note, combined with the conduct and actions of Parkview and CMHC following execution and delivery of the Note, effectively granted CMHC control over Parkview's cash management system, restricted Parkview's ability to incur debt, and placed restrictions on Parkview's ability to contract with trade vendors or others.

23.     Parkview and CMHC entered into four extension agreements with respect to the Note pursuant to which, cumulatively, the term with respect to the Note was enlarged to and including September 16, 2018, which is the current, stated maturity date of the Note.

24.     By virtue of the aforementioned extensions, the Covenants remained in effect at all times relevant to this First Amended Complaint from and after April 25, 2008, and until the Petition Date.

25.     Further, by virtue of the aforementioned extensions, CMHC benefited from the control and influence it exerted over Parkview, to the detriment of Parkview, including as a result of the Covenants as well as other unfavorable lending terms.

26.     On or about April 14, 2009, the Debtor and CMHC entered into that certain Administrative Support and Service Agreement (the "ASA").

27.     Pursuant to the ASA, CMHC, as a corporate entity, became Parkview's Chief Executive Officer ("CEO").  Without limitation of its role as Chief Executive Officer, in the ASA, CMHC agreed to provide administrative support services to Parkview and provide hospital leadership through a qualified hospital administrator and qualified finance officer to be hired by and paid by CMHC.  In addition, pursuant to the ASA, CMHC agreed to provide, without limitation, the following services: (A) assistance with licensing and permitting requirements; (B) preparation of a business plan for Parkview, including management goals and objectives and methods to achieve them; (C) budget preparation; (D) supervision of accounting procedures; (E) budget implementation; (F) deposit of funds and disbursement of funds into and from Parkview's operating account; and (G) use of funds in Parkview's operating account to pay liabilities, including alleged liabilities to CMHC.  CMHC also was required to provide some or all of the foregoing services, or similar services (exclusive of the provision of a hospital administrator and

financial officer), pursuant to other contracts by and between Parkview and CMHC, including, without limitation, pursuant to that certain Billing Services Management Agreement dated January 1, 2010, and all amendments thereto or extensions thereof (collectively, the "BSMA"). Collectively, such services and obligations to be performed by CMHC pursuant to the ASA or BSMA shall be referred to herein as the "ASA Services."

28.    At all relevant times from and after April 14, 2009, until the Petition Date, CMHC did, in fact, serve as CEO of Parkview, and it provided many of the foregoing ASA Services.

29.    At all relevant times prior to the Petition Date, hospital administrators, all employees of CMHC, served as President of Parkview ("President" or "Presidents").

30.    At all relevant times prior to the Petition Date, financial officers, all employees of CMHC, served as Chief Financial Officer ("CFO" or "CFOs") of Parkview.

31.    At all relevant times prior to the Petition Date, the President and CFO of Parkview were hired by, compensated by, and served as employees of CMHC, subject to performance review and evaluation by CMHC.

32.    Each person serving as President was a liaison between Parkview and CMHC and was required to "act on behalf of CMHC to facilitate the performance by CMHC of its administrative duties" under the ASA.  *See* ASA, § 2.03.

33.    Under the ASA, Parkview was required to pay an administrative fee and other charges to CMHC for provision of the ASA Services.  All payments for such ASA Services were made in arrears.

34.    There were other contracts or agreements between Parkview and CMHC pursuant to which payments were made by Parkview to CMHC.  Such payments were made in arrears.

35.     Parkview has also entered into certain contracts or agreements with CMMC pursuant to which payments were made by Parkview to CMMC.  All of such payments were made in arrears.

36.     At all times relevant to this First Amended Complaint, CMHC was in control of Parkview and/or served as an officer of Parkview.

37.     By virtue of the ASA and/or the BSMA and on and after the execution of each such agreement and until the Petition Date, CMHC was an insider and an affiliate of Parkview, within the meaning of § 3572 of MUFTA and § 101 of the Bankruptcy Code.

38.     By virtue of the Covenants and provisions of the 2008 Loan and the ASA and/or BSMA, and the performance by CMHC and Parkview of the provisions thereof, CMHC was, at all times commencing with the closing of the 2008 Loan and continuing through the Petition Date, in control of Parkview.

39.     CMMC is an insider and an affiliate of CMHC, within the meaning of § 3572 of MUFTA and the Bankruptcy Code.

40.     Without limitation of the foregoing: (A) CMHC was an officer of Parkview, (B) CMHC was in control of Parkview, (C) CMHC was an affiliate of Parkview, and/or (D) CMHC was the managing agent of Parkview.

41.     At all times relevant to this First Amended Complaint, CMMC was an insider of Parkview because it was an affiliate of CMHC.

42.     Upon information and belief, in the six years prior to the Petition Date, Parkview made transfers totaling not less than **$10,515,362.78** to the CM Entities, allegedly on account of the following: (1) the Note (the "<u>Note Transfers</u>"); amounts then due for ASA Services, including under the BSMA (the "<u>ASA Services Transfers</u>"); amounts then due for other contracts

or agreements with CMHC (the "Other CMHC Transfers" and together with the Note Transfers and ASA Services Transfers, the "CMHC Transfers"); amounts then due for contracts or agreements with CMMC (the "CMMC Transfers"); amounts then due for other contracts or agreements with BHS (the "BHS Transfers").

43.   On or about August 16 or 19, 2013, Parkview transferred certain parcels of real property located in Brunswick, Maine (the "2013 Real Estate") to CMHC, in partial satisfaction of antecedent debt (the "2013 RE Transaction").  Upon information and belief, such 2013 Real Estate had a fair market value of approximately **$5,200,000.00** at the time of the 2013 RE Transaction.

44.   Upon information and belief, at the time of each of the CMHC Transfers, the CMMC transfers, the BHS Transfers, and the 2013 RE Transfer, (A) CMHC was an insider of Parkveiew; (B) Parkview was  insolvent, (C) Parkview was unable to pay its debts as they became due, and/or (D) Parkview was undercapitalized.

45.   In addition, and between 2009 and 2015, CMHC using its ability to control Parkview's operations (which power was granted by, among other things, CMHC's position as an officer and insider of Parkview), agreed and collaborated with CMMC and emergency room physicians in the employ of CMMC to, *inter alia,* improperly require Parkview to transfer many patients presenting at Parkview (including at the Parkview Emergency Room) wth symptoms or conditions requiring expensive medical procedures to CMHC for treatment, notwithstanding Parkview's ability and willingness to provide the treatment in-house.  The foregoing was done with the intent that revenues which should have been received by Parkview were in fact diverted to CMMC.

46.     Per CMHC's own calculations, this improper transfer of patients from Parkview to CMHC deprived Parkview of approximately $20,000,000 in annual revenue.

**COUNT I**
**(Debtor v. CMHC)**

**(Avoidance And Recovery Of Fraudulent Transfers Made To An Insider Pursuant To § 3576(2) Of MUFTA And § 544(b) Of The Bankruptcy Code)**

47.     Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint.

48.     The Note Transfers were transfers on account of an antecedent debt within the meaning of § 3576(2) of title 14 of the Maine Revised Statutes ("MUFTA").

49.     The ASA Services Transfers were transfers on account of antecedent debts within the meaning of § 3576(2) of MUFTA.

50.     The Other CMHC Transfers were transfers on account of antecedent debts within the meaning of § 3576(2) of MUFTA.

51.     The 2013 RE Transfer was a transfer on account of antecedent debts within the meaning of § 3576(2) of MUFTA.

52.     The Note Transfers, the ASA Services Transfers, the Other CMHC Transfers and the 2013 RE Transfer were transfers to an insider, namely CMHC.

53.     Upon information and belief, Parkview was insolvent at the time that all of the foregoing Transfers were made.

54.     The CM Entities had reasonable cause to believe that Parkview was insolvent at such times, in that, without limitation, at all relevant times, CMHC was Parkview's CEO, and was in control of Parkview, or served as its managing agent.

55.    Moreover, in connection with due diligence conducted by CMHC following the 2008 Loan with respect to a proposed affiliation between Parkview and CMHC, on August 29, 2008, CMHC's attorneys reported to CMHC that "[w]e have reviewed audited financial statements and auditors' comments for the last five years, through the fiscal year ending December 31, 2007.  The most recent audit raised questions about PAMC's sustainability as a 'going concern'.  Analysis of the projected revenues and expenses of PAMC, and its financial viability as a 'going concern', are beyond the scope of this report."  Letter from Michael R. Poulin, attorney with Skelton, Taintor & Abbott, to Charles T. Orne, Executive Vice President and Treasurer of CMHC, dated August 28, 2008, re: Report on Parkview Adventist Medical Center.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the all of the foregoing transfers, including the CMHC Transfers and the 2013 RE Transfer were fraudulent transfers within the meaning of § 3576(2) of MUFTA; (b) award damages to Parkview in the amount of twice the value of such transfers pursuant to § 3578(1)(C)(3) of MUFTA and § 550(a) of the Bankruptcy Code; (c) in addition, or in the alternative to an award of damages with respect to the 2013 RE Transfer, avoid the 2013 RE Transfer; (d) order CMHC to pay Parkview's attorneys' fees and costs in connection with this claim; and (e) grant such further and additional relief as the Court deems just and proper.

### COUNT II
### (Debtor v. CMHC, CMMC, and BHS)

**(Avoidance And Recovery Of Fraudulent Transfers Made With Actual Intent To Hinder or Delay Other Creditors Of Parkview Pursuant To § 3575(1)(A) Of MUFTA And § 544(b) Of The Bankruptcy Code)**

56.    Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint.

57.    Upon information and belief, the Note Transfers, ASA Transfers, Other CMHC Transfers, BHS Transfers, 2013 RE Transfer and CMMC Transfers were made with actual intent to hinder or delay other creditors of Parkview.  Without limiting the generality of the foregoing, CMHC exercised its control over Parkview to cause the foregoing transfers to be made for the benefit of itself and its affiliates, in order to assure payment of Parkview's alleged obligations to the CM Entities, rather than to other creditors of Parkview.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the CMHC Transfers, the 2013 RE Transfer, the BHS Transfers, and the CMMC Transfers were fraudulent transfers within the meaning of § 3575(1)(A) of MUFTA and § 548 of the Bankruptcy Code; (b) award damages to Parkview in the amount of twice the value of such transfers, pursuant to § 3578(1)(C)(3) of MUFTA and § 550(a) of the Bankruptcy Code; (c) in addition, or in the alternative to an award of damages with respect to the 2013 RE Transfer, avoid the 2013 RE Transfer; (d) order the CM Entities to pay Parkview's attorneys' fees and costs in connection with this claim; and (e) grant such further and additional relief as the Court deems just and proper.

### COUNT III
### (Debtor v. CMMC)

**(Avoidance And Recovery Of Fraudulent Transfers Made To An Insider Pursuant To § 3576(2) Of MUFTA And § 544(b) Of The Bankruptcy Code)**

58.    Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint.

59.    The CMMC Transfers were transfers on account of antecedent debts within the meaning of § 3576(2) of MUFTA.

60.    The CMMC Transfers were transfers to an insider, namely CMMC.

61.    Upon information and belief, Parkview was insolvent at the time that the CMMC Transfers were made.

62.    As an affiliate of CMHC (an insider of Parkview), CMMC had reasonable cause to believe that Parkview was insolvent at the time that some or all of the CMMC Transfers were made.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the CMMC Transfers were fraudulent transfers within the meaning of § 3576(2) of MUFTA; (b) award damages to Parkview in the amount of twice the value of the CMMC Transfers pursuant to § 3578(1)(C)(3) of MUFTA and § 550(a) of the Bankruptcy Code; (c) order CMMC to pay Parkview's attorneys' fees and costs in connection with this action; and (d) grant such further and additional relief as the Court deems just and proper.

## COUNT IV
## (Debtor v. BHS)

## (Avoidance And Recovery Of Fraudulent Transfers Made To An Insider Pursuant To § 3576(2) Of MUFTA And § 544(b) Of The Bankruptcy Code)

63.    Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint.

64.    The BHS Transfers were transfers on account of antecedent debts within the meaning of § 3576(2) of MUFTA.

65.    The BHS Transfers were transfers to an insider, namely BHS.

66.    Upon information and belief, Parkview was insolvent at the time that the BHS Transfers were made.

67.    As an affiliate of CMHC, BHS had reasonable cause to believe that Parkview was insolvent at the time that some or all of the BHS Transfers were made

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the BHS Transfers were fraudulent transfers within the meaning of § 3576(2) of MUFTA; (b) award damages to Parkview in the amount of twice the value of the BHS Transfers pursuant to § 3578(1)(C)(3) of MUFTA and § 550(a) of the Bankruptcy Code; (c) order BHS to pay Parkview's attorneys' fees and costs in connection with this action; and (d) grant such further and additional relief as the Court deems just and proper.

### COUNT V
### (Debtor v. CMHC, CMMC, and BHS)

**(Avoidance And Recovery Of Preferential Transfers Made In The 90 Day Period Preceding The Petition Date Pursuant To § 547(b) Of The Bankruptcy Code)**

68.    Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint.

69.    Upon information and belief, in the 90 day period preceding the Petition Date, Parkview made transfers to CMHC (the "CMHC 90 Day Transfers").

70.    Upon information and belief, in the 90 day period preceding the Petition Date, Parkview made transfers to CMMC (the "CMMC 90 Day Transfers").

71.    Upon information and belief, in the 90 day period preceding the Petition Date, Parkview made transfers to BHS (the "BHS 90 Day Transfers" and together with the CMHC 90 Day Transfers and CMMC 90 Day Transfers, the "90 Day Transfers").

72.    The 90 Day Transfers were made on account of antecedent debts purportedly owed by Parkview prior to such transfers having been made.

73.    The 90 Day Transfers were made at a time when Parkview was insolvent.

74.    By virtue of such 90 Day Transfers, each of the transferees received more than they or any one of them would have received if the transfers had not been made, Parkview were

liquidated pursuant to Chapter 7 of the Bankruptcy Code, and the transferees had received payment in accordance with the provisions of Chapter 7 of the Bankruptcy Code.

WHEREFORE, the Debtor respectfully requests that the Court  (a) determine that the 90 Day Transfers were preferential transfers within the meaning of § 547(b) of the Bankruptcy Code; (b) award damages to Parkview in the amount of the value of the 90 Day pursuant to § 550(a) of the Bankruptcy Code; (c) in addition, or in the alternative to an award of damages with respect to the 90 Day Transfers, avoid the 90 Day Transfers; (d) order the CM Entities to pay Parkview's attorneys' fees and costs in connection with this claim; and (e) grant such further and additional relief as the Court deems just and proper.

<u>**COUNT VI**</u>
<u>**(Debtor v. CMHC, CMMC, and BHS)**</u>

**(Avoidance And Recovery Of Preferential Transfers Made Between 90 Days And One Year <u>Preceding The Petition Date Pursuant To § 547(b) Of The Bankruptcy Code)</u>**

75.    Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint.

76.    Upon information and belief, between 90 days prior to the Petition Date and one year prior to the Petition Date (the "<u>Insider Preference Period</u>"), Parkview made transfers to CMHC (the "<u>CMHC Insider Transfers</u>").

77.    Upon information and belief, during the Insider Preference Period, Parkview made to CMMC (the "<u>CMMC Insider Transfers</u>").

78.    Upon information and belief, during the Insider Preference Period, Parkview made transfers to BHS (the "<u>BHS Insider Transfers</u>" and together with the CMHC Insider Transfers and the CMMC Insider Transfers, the "<u>Insider Transfers</u>").

79.     The Insider Transfers were made on account of antecedent debts purportedly owed by Parkview.

80.     The Insider Transfers were made at a time when Parkview was insolvent.

81.     Each of CMHC, CMMC, and BHS were insiders of Parkview, within the meaning of the Bankruptcy Code, at the times when the Insider Transfers were made.

82.     By virtue of such Insider Transfers, each of the transferees received more than they or any one of them would receive if this was a case under Chapter 7 of the Bankruptcy Code, the Insider Transfers had not been made, and the transferees each received payment on account of the obligations giving rise to such transfers to the extent provided by the Bankruptcy Code.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the Insider Transfers were preferential transfers within the meaning of § 547(b) of the Bankruptcy Code; (b) award damages to Parkview in the amount of the value of the Insider Transfers pursuant to § 550(a) of the Bankruptcy Code; (c) in addition or in the alternative to an award of damages with respect to the Insider Transfers, avoid the Insider Transfers; (d) order the CM Entities to pay Parkview's attorneys' fees and costs in connection with this claim; and (e) grant such further and additional relief as the Court deems just and proper.

## COUNT VII
### (Debtor v. CMHC, CMMC, and BHS)

### (Avoidance And Recovery Of Fraudulent Transfers Pursuant To § 548(a)(1)(A) Of The Bankruptcy Code)

83.     Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint.

84.    Upon information and belief, in the two year period preceding the Petition Date, Parkview made transfers to CMHC (the "CMHC Two Year Transfers").

85.    In addition, Parkview made the 2013 RE Transfer to CMHC within the two year period prior to the Petition Date.

86.    Upon information and belief, in the two year period preceding the Petition Date, Parkview made transfers to CMMC (the "CMMC Two Year Transfers").

87.    Upon information and belief, in the two year period preceding the Petition Date, Parkview made transfers to BHS (the "BHS Two Year Transfers" and together with the CMHC Two Year Transfers, the 2013 RE Transfer, and CMMC Two Year Transfers, the "Two Year Transfers").

88.    Upon information and belief, Parkview made such Two Year Transfers with actual intent to hinder or delay then-present or future creditors.  Without limiting the generality of the foregoing, CMHC and its affiliates, CMMC and BHS, exercised their control over Parkview to cause the foregoing transfers to be made in order to assure payment of Parkview's alleged obligations to the CM Entities, rather than to other creditors of Parkview.

89.    Such Two Year Transfers are avoidable fraudulent transfers under § 548(a)(1)(A) of the Bankruptcy Code.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the Two Year Transfers were fraudulent transfer within the meaning of § 548(a)(1)(A) of the Bankruptcy Code; (b) award damages to Parkview in the amount of the value of the Two Year Transfers pursuant to § 550(a) of the Bankruptcy Code; (c) in addition or in the alternative to an award of damages with respect to such transfers, avoid such transfers; (d) order the transferees to

pay Parkview's attorneys' fees and costs in connection with this claim; and (e) grant such further and additional relief as the Court deems just and proper.

**COUNT VIII**
**(Debtor v. CMHC)**

**(Recharacterization or Equitable Subordination Of The 2008 Loan Pursuant To § 510(c) Of The Bankruptcy Code)**

90.     Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint as set forth above.

91.     All or a portion of the debt owed to CMCH pursuant to the Note and under any other agreement by, among, or between Parkview and CMHC should be recharacterized and treated as capital contributions.

92.     Alternatively, under the principles of equitable subordination and pursuant to § 510 of the Bankruptcy Code, the claims of each of the CM Entities, to the extent such claims are or become allowed claims, should be equitably subordinated to the claims of all other creditors of Parkview for the reasons set forth in this Amended Complaint, and for other reasons.

WHEREFORE, the Debtor respectfully requests that the Court enter its order (a) determining that all claims of CMHC should be recharacterized as capital contributions; (b) in the alternative, determining that CMHC's claims, to the extent that such claims are or become allowed claims, are equitably subordinated to the claims of all other creditors of Parkview; (c) determining that CMMC's claims, to the extent that they are or become allowed claims, are equitably subordinated to the claims of all other creditors of Parkview; and (d) granting such further and additional relief as the Court deems just and proper.

## COUNT IX
### (Debtor v. CMHC, CMMC, and BHS)

**(Avoidance And Recovery Of Fraudulent Transfers Made Without Reasonably Equivalent Value Pursuant To § 3575(B) Of MUFTA And § 544(b) Of The Bankruptcy Code)**

93.     Parkview repeats and realleges, as if set forth fully herein, each and every allegation in this First Amended Complaint as set forth above.

94.     The Note Transfers, ASA Transfers, Other CMHC Transfers, 2013 RE Transfer, CMMC Transfers, and BHS Transfers were made without Parkview receiving reasonably equivalent value in exchange for such transfers or obligations.

95.     Upon information and belief, at the time of the foregoing transfers, Parkview either (A) was engaged or was about to engage in a business or transaction for which Parkview's remaining assets were unreasonably small in relation to such business or transaction, or (B) intended to incur, or believed or reasonable should have believed that it would incur, debts beyond its ability to pay as the debts became due.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the CMHC Transfers, the 2013 RE Transfer, the CMMC Transfers, and BHS Transfers were fraudulent transfers within the meaning of § 3575(1)(B) of MUFTA; (b) award damages to Parkview in the amount of twice the value of such transfers, an amount not less than $30 million, pursuant to § 3578(1)(C)(3) of MUFTA and § 550(a) of the Bankruptcy Code; (c) in addition, or in the alternative to an award of damages with respect to the 2013 RE Transfer, avoid the 2013 RE Transfer; (d) order CMHC and CMMC to pay Parkview's attorneys' fees and costs in connection with this claim; and (e) grant such further and additional relief as the Court deems just and proper.

## COUNT X
## (Debtor v. CMHC)

### (CMHC Breach Of Fiduciary Duties And/Or Negligence As CEO And Insider Of Parkview)

96.      Parkview repeats and realleges, as if set forth fully herein, each and every allegation of paragraphs 1 through 93 set forth above in this First Amended Complaint.

97.      From and after execution and delivery of the ASA, CMHC was CEO and an insider of Parkview.

98.      As such, CMHC had statutory and common law fiduciary duties to Parkview, including those duties set forth in § 720(1) of Title 13-B of the Maine Revised Statutes.

99.      CMHC breached such duties including, without limitation, by (1) permitting and/or causing Parkview to make the transfers to the CM Entities alleged in this First Amended Complaint, at times when Parkview was insolvent, unable to pay its debts as they became due, and/or undercapitalized; and (2) engaging in self-dealing transactions that were not equitable s to Parkview and not fair or entirely fair to Parkview.  The self-dealing transactions engaged in by CMHC, and referred to above, include, without limitation, seeking extensions of the Note that were not on terms that were equitable or fair or entirely fair to Parkview; appropriating corporate opportunities for itself, including by hiring physicians affiliated with Parkview and then closing such physician practices at Parkview and diverting patients from Parkview to CMHC; and/or by interfering with and restricting the growth and development of Parkview to CMHC's benefit and Parkview's detriment.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the CMHC breached its fiduciary duties and/or was negligent; (b) award damages to Parkview for such breaches; and (c) grant such further and additional relief as the Court deems just and proper.

## COUNT XI
## (Debtor v. CMHC, CMMC, and BHS)

## (Declaratory Judgment That Certain Transactions With CMHC, CMMC, And BHS Were Void *Ab Initio* And/Or Conflict-Of-Interest Transactions For Which CMHC, CMMC, And BHS Are Liable)

100.    Parkview repeats and realleges, as if set forth fully herein, each and every

allegation in this First Amended Complaint.

101.    Under § 721(1) of title 13-B of the Maine Revised Statutes:

The funds or assets of a public benefit corporation may not be transferred or applied and a director or officer of a public benefit corporation may not authorize the transfer or application of funds or assets of the public benefit corporation if:

A. The transfer constitutes a conflict-of-interest transaction that is neither fair nor properly approved as determined under section 718;

B. The transfer misapplies the funds or assets in violation of statute, including conversion transactions in violation of Title 5, sections 194-C to 194-H; [or]

C. The transfer is to a director or officer of the public benefit corporation or to another person in a position to exercise substantial influence over the affairs of the corporation and constitutes private inurement or excess benefits that exceed the fair market value of the property or services received in return[.]

102.    Parkview was at all times relevant to this First Amended Complaint a public

benefit corporation.

103.    At, and at all times after, the time of the 2008 Loan, CMHC was a "person in a

position to exercise substantial influence over the affairs of the corporation [Parkview.]"  As

affiliates of CMHC, CMMC and BHS also were "person[s] in a position to exercise substantial

influence over the affairs of the corporation[.]"

104.    At and after the time the ASA was executed and delivered, CMHC was an officer

of Parkview.

104.    Any and all transfers by Parkview to CMHC and/or CMMC and/or BHS after the

2008 Loan were transfers in violation of § 721(1), in that, without limitation, (1) they were

conflict of interest transactions, that were neither fair nor properly approved; and/or (2) they were transfers to or for the benefit of an officer or other person in control and such transfers constitute private inurement or excess benefits that exceed fair market value.

WHEREFORE, the Debtor respectfully requests that the Court (a) determine that the 2008 Loan, the ASA, and other agreements entered into after the 2008 Loan are void *ab initio* pursuant to § 721(1) of title 13-B of the Maine Revised Statutes; (b) determine that the CM Entities are liable for repayment to Parkview of all payments or the value of payments received by them on account of the 2008 Loan, the ASA and such other agreements, and order the return of such payments or the value of such transfers; (c) determine that transfers of the administrative fee under the ASA and/or BSMA were conflict-of-interest transactions that were not fair to Parkview and for which CMHC is liable and order CMHC to pay damages to the estate of the Debtor in the amount of such transfers; and (d) grant such further and additional relief as the Court deems just and proper.

## COUNT XII
### (Debtor v. CMHC, CMMC, and BHS)

### (Disallowance of CMHC's, CMMC's, and BHS's Claims Against the Estate Pursuant to § 502(d) of the Bankruptcy Code)

105.   Parkview repeats and realleges, as is set forth fully herein, each and every allegation in this First Amended Complaint.

106.   Section 502(d) of the Bankruptcy Code provides that "[n]otwithstanding subsections (a) and (b) of this section, the court **shall disallow** any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title unless such entity has paid the amount of, or turned over any such property, for the

which such entity or transferee is liable under section 552(i), 542, 543, 550, 04 553 of this title. (Emphasis added).

107.    CMHC has already asserted claims against the Debtor's estate pursuant to the Bankruptcy Code and, upon information and belief, CMHC, CMMC and/or BHS may assert additional claims against Parkview's estate pursuant to the provisions of the Bankruptcy Code.

WHEREFORE, the Debtor respectfully requests, to the extent that CMHC, CMMC, and/or BHS have, or will in the future, assert claims against the Parkview estate pursuant to the provisions of the Bankruptcy Code, that those claims be disallowed in full until such time as CMHC, CMMC, and/or BHS have satisfied the repayment and turnover provisions of Section 502(d) of the Bankruptcy Code.

## COUNT XIII
## (Debtor v. CMHC)

## (Violation of Sherman Act 15 U.S.C. § 1)

108.    Parkview repeats and realleges, as if fully set forth herein, each and every allegation in this First Amended Complaint.

109.    At all relevant times, Parkview and CMHC were engaged in interstate commerce.

110.    In 2008, CMHC formulated a plan to take control of Parkview with the intent of diverting patients from Parkview to CMHC's (or its affiliate's) hospital facilities in Lewiston.

111.    CMHC was aware that its plan: (1) would affect the Maine mid-coast market for hospital and medical services; and (2) would impact competition in the health care industry and relevant health care industry market; and (3) as a result, would require a Certificate of Need ("CON") to be issued by Maine's Department of Health and Human Services pursuant to 22 M.R.S.A. § 329.

112.    CMHC, through its employees and agents, represented to Parkview that it would apply for and obtain a CON to acquire Parkview and that Parkview would benefit financially and its mission furthered through an affiliation with CMHC.

113.    In May of 2008, CMHC filed a letter of intent to acquire ownership and control of Parkview with the Maine Department of Health and Human Services pursuant to 22 M.R.S.A. § 337.

114.    Notwithstanding the letter of intent and representations made to Parkview, CMHC never filed an application for a CON in connection with the May 2008 letter of intent, and as a result its letter of intent was deemed withdrawn pursuant to 22 M.R.S.A. § 337.

115.    Maine regulatory officials were skeptical about CMHC's motivations for acquiring Parkview and were concerned that CMHC's *de facto* exercise of control over Parkview would have an adverse impact on competition in the Maine mid-coast market for health care services.

116.    On December 15, 2008, Donald W. Grove, Deputy Superintendent of the Maine Bureau of Financial Institutions sent an e-mail to Larry D. Carbonneau, Health Care Analyst with the Certificate of Need Unit of the Department of Human Services, which in relevant part stated:

> Regardless of whether or not Central Maine Health Care controls Parkview, Central Maine Health appears to have gambled $5.6 million that DHHS will ultimately approve their acquisition of Parkview under a CON application."

117.    In a follow-up e-mail sent on December 16, 2008, Mr. Grove wrote to Mr. Carbonneau:

> Provisions such as not incurring additional debt, making capital acquisitions, providing weekly financial reports, and limits on purchase orders are not unusual in the context of an asset-based lending facility, particularly to a troubled company. As I indicated in my prior e-mail, it is these provisions in the note in

combination with the fact that a rational lender would not have made the loan to an entity in the condition of Parkview without obtaining the subordination of the other two secured lenders that causes me to believe that Central Maine Health has motivations with respect to Parkview that go well beyond being a lender.  Unless DHHS can set the loan aside in the context of a CON approving the merger of Parkview with another entity, the loan is a "poison pill" designed to keep others away and forces DHHS just to deal with Central Maine Health; unless of course, DHHS simply closes Parkview and appoints a Receiver (assuming that DHHS has that authority).

118.    Despite the fact that it had not secured CON approval, on April 14, 2009, CMHC and Parkview entered into the ASA.  At that time, Parkview still believed CMHC would apply for and obtain a CON and that its affiliation with CMHC would benefit Parkview financially and further its mission.

119.    On August 28, 2012, CMHC filed a second letter of intent for a CON application with the Department of Human Services.

120.    At a technical assistance meeting held on January 17, 2013, pursuant to 22 M.R.S.A. § 335(6)(B), staff for the Department of Human Services informed CMHC that its CON application was likely to be denied in the preliminary analysis and informed CMHC of criteria for which it could not render approval.

121.    The Department of Human Services gave CMHC an opportunity to submit additional information with a deadline of February 2, 2013.

122.    Counsel for CMHC requested, and was granted, an extension of the deadline for additional information until February 26, 2013.

123.    Instead of providing the additional information, CMHC requested that the CON review process be suspended.

124.    In a letter dated July 17, 2013, Kenneth J. Albert, Director, Division of Licensing

and Regulatory Services of the Department of Health and Human Services wrote to CMHC.  In

the letter, Mr. Albert stated in pertinent part:

> As detailed in my letters dated June 18, 2013, we have learned that CMHC has
> taken further efforts to acquire ownership and control of PAMC during the
> suspension period.  For example, your lawyer confirmed on June 28 and July 2,
> 2013 that CMHC has entered into purchase and sale agreements to acquire real
> property from PAMC, with a closing scheduled this month.  While we understand
> that your position is that these transactions are exempt from CON review under
> 22 M.R.S. § 329(3), the position of DHHS is that these transactions are evidence
> of further efforts by CMHC to acquire ownership and control of PAMC under 22
> M.R.S. § 329(1).

125.    The letter also provided in pertinent part:

> DHHS has the authority under the CON Act, 22 M.R.S. § 349-A, to seek
> information about CMHC and PAMC's compliance with the CON Act.  Under
> that authority, DHHS asked CMHC and PAMC to provide additional information
> about activities related to CMHC's acquisition of ownership and control of
> PAMC from January 1, 2011 to June 28, 2013 (which includes the suspension
> period), but CMHC and PAMC declined.   Your refusal to provide such
> information leaves me with the strong impression that the information would have
> indicated that these activities continue to occur, despite the suspension of CON
> review.

126.    The letter also provided in pertinent part:

> The CON Act requires certain projects - including yours - to undergo review in a
> public process according to a well-defined set of criteria and standards.  Indeed,
> one of the fundamental purposes of the CON Act is to '[e]nsure public
> participation in the process of determining the array, distribution, quantity, quality
> and cost of . . . health services.'  22 M.R.S. § 327(2)(E).  Allowing CMHC to
> further its acquisition of ownership and control, while purportedly suspending
> CON review, would be directly contrary to the express terms and purposes
> underlying the CON Act.  Simply put, an applicant cannot continue - out of the
> public eye - a project which requires CON review after the applicant requests that
> CON review be suspended.

127.    The letter also provided in pertinent part:

> For the foregoing reasons, DHHS revokes its authorization of suspension of
> review of your CON application.  Pursuant to 22 M.R.S. § 335(6)(B)(3), you have
> the opportunity to offer additional information to the record, including the

information we requested at our meeting on January 17, 2013, no later than July 31, 2013.  DHHS will use that information in completing its preliminary analysis soon thereafter.  22 M.R.S. § 335(6)(B)(3).

128.    On August 19, 2013, Attorney Michael Poulin, Esq., in his capacity as counsel for CMHC, wrote to the Assistant Attorney General for the State of Maine advising that CMHC was withdrawing its application for a CON to acquire control of Parkview.

129.    CMHC's continuing exercise of control over Parkview was a deliberate and intentional violation of the Maine Certificate of Need Act of 2002, 22 M.R.S.A. § 326, et seq. and was undertaken for the purpose of continuing, without regulatory approval, the diversion of patients from Parkview and the mid-coast market to CMHC's hospital facilities in Lewiston.

130.    CMHC did in fact divert patients to its Lewiston hospital facilities who otherwise would have received treatment from Parkview.

131.    The diversion of Parkview's patients to CMHC's facilities in Lewiston damaged Parkview, in that, without limitation, it caused Parkview to lose approximately $20 million in annual revenue it otherwise would have earned.

132.    The affiliation between CMHC and Parkview, the resulting diversion of patients from Parkview to CMHC, and the effective elimination of Parkview as a competitor for the provision of services to patients in the mid-coast region,  constituted an agreement, combination and conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1 *et seq*.

WHEREFORE, the Debtor prays for (a) damages according to proof; (b) that those damages be trebled; (c) that it be awarded its reasonable attorneys' fees and costs; and (d) that the Court provides such other additional relief as it deems appropriate in the circumstances.

## COUNT XIV
### (Debtor v. CMHC)

### (Violation of State Antitrust Laws, 10 M.R.S.A. § 1101 et seq.)

133.    Parkview repeats and realleges, as if fully set forth herein, each and every allegation in this First Amended Complaint.

134.    The affiliation between CMHC and Parkview, the resulting diversion of patients from Parkview to CMHC, and the effective elimination of Parkview as a competitor for the provision of services to patients in the mid-coast region, constituted an agreement, combination and conspiracy in restraint of trade in violation of 10 M.R.S.A. § 1101 *et seq*.

WHEREFORE, the Debtor prays for (a) damages according to proof; (b) that those damages be trebled; (c) that it be awarded its reasonable attorneys' fees and costs; and (d) that the Court provides such other additional relief as it deems appropriate in the circumstances.

## COUNT XV
## (Debtor v. CMHC)

## (Surcharge, 11 U.S.C. § 506(c))

135.    Parkview repeats and realleges, as if fully set forth herein, each and every allegation in this First Amended Complaint.

136.    In July of 2015, Parkview requested authority to sell substantially all of its assets (the "Transferred Assets") to Mid Coast Hospital ("Mid Coast") in a private sale pursuant to 11 U.S.C. § 363.

137.    In August of 2015, the Bankruptcy Court approved the sale of the Transferred Assets to Mid Coast and Parkview and Mid Coast consummated said sale.

138.    CMHC claims to have security interests in many of the Transferred Assets and the proceeds thereof; Parkview denies that CMHC has any claims against the bankruptcy estate secured by the Transferred Assets or the proceeds thereof.

139.    Parkview expended significant sums to marshal and liquidate the Transferred Assets.  Those expenditures were both necessary and reasonable.

140.    In addition to the Transferred Assets, Parkview is administering and/or liquidating other assets in which CMHC claims a security interest, for the potential benefit of CMHC and at substantial cost and expense to Parkview.

141.    To the extent that it is ultimately determined that CMHC does in fact have claims secured by valid, enforceable liens in the Transferred Assets, and/or other assets of Parkview, and the proceeds thereof (which Parkview denies), then CMHC benefitted from the necessary and reasonable expenses incurred and to be incurred by Parkview in marshaling and liquidating such assets, and, pursuant to 11 U.S.C. § 506(c), Parkview is entitled to surcharge CMHC for those expenses.

WHEREFORE, the Debtor requests that the Court (a) find and determine that the costs expenses incurred and to be incurred by Parkview in marshaling and liquidating the Transferred assets and other assets were and are necessary and reasonable; (b) determine, to the extent that CMHC has claims against the estate secured by valid and enforceable liens in the Transferred Assets and/or other assets, that CMHC benefitted from those necessary and reasonable expenditures; (c) surcharge CMHC for those necessary and reasonable expenses pursuant to 11 U.S.C. § 506(c); and (d) grant such other relief as it deems appropriate in the circumstances.

*The Debtor requests a trial by jury.*

Dated:  September 17, 2015                     /s/ David C. Johnson
                                               George J. Marcus
                                               Lee H. Bals
                                               Jennie L. Clegg
                                               David C. Johnson

                                               MARCUS, CLEGG & MISTRETTA, P.A.
                                               One Canal Plaza, Suite 600
                                               Portland, ME  04101
                                               (207) 828-8000

                                               Counsel for Parkview Adventist Medical Center

29

## CERTIFICATE OF SERVICE

       I, David C. Johnson, being over the age of eighteen hereby certify that on this date I caused the above document to be filed via the CM/ECF System.  Persons who are served as part of the CM/ECF system are designated in the Electronic Mail Notice List section of the attached service below:

Dated:  September 17, 2015             /s/David C. Johnson
                                       David C. Johnson

                                       MARCUS, CLEGG & MISTRETTA, P.A.
                                       One Canal Plaza, Suite 600
                                       Portland, ME  04101
                                       (207) 828-8000

                                       Counsel for Parkview Adventist Medical Center

**Mailing Information for Case 15-02019**

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- Amy P. Dieterich     adieterich@sta-law.com, jlhommedieu@sta-law.com
- Jeremy R. Fischer     jfischer@dwmlaw.com, hwhite@dwmlaw.com; astead@dwmlaw.com
- George J. Marcus     bankruptcy@mcm-law.com
- Michael R. Poulin     mpoulin@sta-law.com, lrines@sta-law.com

**Manual Notice List**

The following is the list of **parties** who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)